### ARGUED AND DETERMINED

#### IN THE

# COURT OF COMMON PLEAS

#### FOR THE

## CITY AND COUNTY OF NEW YORK.

---

### EMILIO ROSSI CORSI *v.* MAX MARETZEK.

In the absence of special statutes, the law does not exclusively recognize any particular system of medicine or class of medical practitioners.

The statutory regulations formerly in force in the state of New York, requiring, as a condition to the right of recovery for medical services, an attendance upon lectures, an examination before a medical board, and a certificate from an organized association, are repealed.

The repealing act (Session Laws of 1844, chap. 275, p. 406) expressly permits any person to practice physic, subject to punishment as for a misdemeanor, if convicted of gross ignorance, malpractice, or immoral conduct.

Medicine is a progressive rather than an exact science; and in determining the legal significance of the word "physician," or "doctor," when used in a contract, the term must be held to mean any person who makes it his regular business to practice physic.

Accordingly, where an agreement of employment between an opera director and a vocalist, provided for a forfeiture of a month's salary in case the latter should fail to attend at any stated performance, except in the event of sickness, certified to by a doctor, to be appointed by the director; *held*, that the provision was binding upon the artist, although the director appointed a person in the practice of what is known as the homeopathic system of medicine.

An announcement of such appointment, publicly posted at the opera house, is a sufficient notice thereof.

The performer having stipulated, in the contract, to conform strictly to the regulations of the opera company "commonly in use;" *held,* that as a condition to his right of salary, he was bound, in case of anticipated indisposition, to give notice thereof to the director on or before one o'clock on the day of performance, evidence having been adduced establishing the existence of a general regulation to that effect in this and similar establishments.

THE defendant was the director of the opera, in the city of New York, and employed the plaintiff as a vocalist. The contract of employment was in writing. Among other provisions, it was stipulated, that in the event of a failure, on the part of the performer, to appear at any entertainment for which he might be announced, he should forfeit a month's salary, and that " sickness must be proved by the doctor appointed by the director."

It was further provided in the contract, that the plaintiff should strictly conform to the regulations of the opera company " commonly in use."

The plaintiff's engagement bound him to sing, " as the first baritone," at all operas and musical entertainments given by the director during a period of six months, and he was to receive a salary of one hundred dollars per month.

This action was commenced to recover salary for two weeks of the prescribed time. The defendant proved, that the plaintiff failed to attend at a concert wherein he had been assigned a part, and that a substitute was employed. The plaintiff offered the evidence of a regular or allopathic physician, to the effect that he was confined, on the evening in question, with disease of the throat.

It was shown, that the director had caused to be conspicuously posted at the opera house, a notice that a certain doctor had been appointed by him, and it appeared in the testimony, that such appointee was a physician practicing what is known as the homeopathic system of medicine.

The evidence of indisposition, produced by the plaintiff, was admitted at the trial, subject to exception by the defend-

ant, who insisted that the alleged fact could be proved only by the director's appointee. The plaintiff claimed, that the appointment was nugatory, the person selected not being a "regular physician."

The testimony disclosed a usage in this and other theatres, whereby it was asserted that the plaintiff was under obligation to give notice to the director, before one o'clock of the day of performance, of his anticipated inability to attend the projected concert. A notice of this description was not given.

The Marine Court gave judgment in favor of the plaintiff for the full amount claimed. The defendant appealed to the general term of this court.

*William C. Russell,* for the defendant.

*Robert Emmet,* for the plaintiff.

By the Court. Daly, J.—The plaintiff was announced to take part in the concert given on the 23d of February, and, unless he was prevented from attending by illness or other sufficient cause, he incurred the forfeiture of a month's salary. To prevent imposition or feigned illness, the parties agreed that "sickness must be proved by the doctor appointed by the director." This clause in the contract is somewhat vague, but the meaning undoubtedly is, that the doctor appointed by the director is to determine, in the event of alleged illness, whether the plaintiff is capable of performing or not. The matter is to be left exclusively to him, as an arbitrator between the parties, and his opinion is to be binding upon both. It was proved by the witnesses, Beneventano and Loder, that Dr. Quin was the physician of the company; that he was appointed by the director, and that notice to that effect was publicly posted up in the opera house. The plaintiff, therefore, is to be presumed to have had knowledge of the fact, and it was his duty, upon being taken sick, to have sent for Dr. Quin, or, at least, to have

notified the manager of his illness before the time of perform-
ance, unless he was so circumstanced that it was impossible
for him to do so.

Indeed, we think that it was incumbent upon him to notify
the manager before one o'clock of the day of performance.
He had bound himself to conform strictly to each and all of
the regulations of the opera company " commonly in use ;"
and it appears, that for the purpose of enabling the manager
to prevent the disappointment of the public, by changing the
performance or procuring a substitute, a regulation existed,
requiring a performer, in the event of possible failure, to give
notice to the manager by one o'clock on the day of perform-
ance. It was not in writing, but Beneventano proved that it
had been adopted from the Theatre La Scala, at Milan, and
was a general regulation in opera houses, and perfectly well
known to all artists and managers. It is fair to presume, that
the plaintiff, as a member of the company, had knowledge of
its existence ; and as the regulation was one essential to the
proper conduct and management of such an establishment, it
was his duty to have notified the manager before one o'clock,
unless his illness occurred after that period.

The fact of the plaintiff's non-attendance at the concert
in question having been proved, it rested with him to show,
by Dr. Quin, that he was incapable of attending from sick-
ness. He was either required to do this, or prove that he had
in due time notified the doctor, or the manager, of his ill-
ness. He offered no such testimony ; but having shown that
Dr. Quin practiced upon principles of homeopathy, he in-
sisted that he was not a doctor, and that the defendant having
failed to appoint a doctor, he was at liberty to show, by gen-
eral testimony, that he was ill upon the night in question. In
this view of the law the justice concurred ; and the plaintiff
called Dr. Kissam, who testified that he attended the plain-
tiff for a disease of the throat in the month of February;
that he could not state the exact time, or whether he had
attended him on the 23d of February, but that it was his
impression that the plaintiff was ill at the time of the con-

cert, because he did not comply with four or five engagements at the witness' house about that time; and having also called another witness, who testified that he saw the plaintiff on the 23d of February, between the parts of the concert, and that he was in bed and ill, the justice gave judgment for the whole amount claimed.

In the opinion delivered by the justice, he says: " Though it was proved that Dr. Quin was appointed by the director, yet it has not been proved that Quin was a doctor, that he had taken a degree as doctor of medicine, or that he was authorized by the medical society, or that he had a regular license to practice, which, I think, was necessary to constitute him a doctor. As far as there was evidence on that subject, it went to show that Dr. Quin practiced upon principles of homeopathy, and such practitioners are not recognized by the faculty of medicine, nor by a majority of the public, as regular practitioners." In this, we think, the justice erred.

By the terms of the contract, the selection of the doctor was left entirely to the defendant, and it was for him to judge of the fitness or capacity of the person to be selected. All that he was required to do, in the fair interpretation of the contract, was to appoint a person who made it his business to practice physic, and it was wholly immaterial to what school of medicine the person so selected belonged, or whether he belonged to any. The legal signification of the term doctor, when employed as it is in this contract, means, simply, a practitioner of physic. The system pursued by the practitioner is immaterial. The law has nothing to do with the merits of particular systems. Their relative merit may become the subject of inquiry when the skill or ability of a practitioner, in any given case, is to be passed upon as a matter of fact. But the law does not, and cannot supply any positive rules for the interpretation of medical science. It is not one of those certain or exact sciences in which truths become established and fixed, but is essentially progressive in its nature, enlarging with the growth of human experience, and subject to those changes and revolutions inci-

dent to any branch of human inquiry, the laws of which are not fully ascertained. The labors of the anatomist, the physi ologist and the chemist have contributed an immense store-house of facts; but the manner in which this knowledge is to be applied in the treatment and cure of diseases has been, and will probably continue to be, open to diversity of opinion. No one system of practice has been uniformly followed, but physicians, from the days of Hippocrates, have been divided into opposing sects and schools. The sects of the dogmatists and the empirics divided the ancient world for centuries, until the rise of the methodics, who, in their turn, gave way to innumerable sects. Theories of practice, believed to be infallible in one age, have been utterly rejected in another. For thirteen centuries Europe yielded to the authority of Galen. He was implicitly followed—his practice strictly pursued. Every thing that seemed to conflict with his precepts was rejected; and yet, in the revolutions of medical opinion, the works of this undoubtedly great man were publicly burned by Paracelsus and his disciples; and for centuries following, the medical world was divided between the Galenists and the chemists, until a complete ascendancy over both was obtained by the sect of the vitalists. This state of things has been occasioned by the circumstance that medical practitioners have often been more given to the formation of theories upon the nature of disease and the mode of its treatment than to that careful observation and patient accumulation of facts, by which, in other sciences, the phenomena of nature has been unraveled. I am far from undervaluing the great benefits conferred upon mankind by the study of medicine, and have no wish to minister to any vulgar prejudice against a useful and learned profession, but it is not to be overlooked that, as an art, it has been characterized, in a greater degree, by fluctuations of opinion as to its principles and the mode of its practice, than, perhaps, any other pursuit. That it has been distinguished by the constant promulgation and explosion of theories. That it has alternated between the advancement of new doctrines and the revival of old

ones, and that its professors in every age have been noted for the tenacity with which they have clung to opinions, and the unanimity with which they have resisted the introduction of valuable discoveries. They still continue to disagree in respect to the treatment of diseases as old as the human race; and, at the present day, when great advances have been made in all departments of knowledge, a radical and fundamental difference divides the allopathists from the followers of Hanneman, to say nothing of those who believe in the sovereign instrumentality of water.

In fact, nothing comparatively is known of the philosophy of disease. Its eradication or cure, where the result of human agency is, in the great majority of instances, attributable rather to the careful observation, judgment and experience of the particular practitioner, than the application of general or established methods available by all. The popular axiom, that "doctors differ," is as true now as it ever was, and as long as it continues to be so, it is impossible for the law to recognize any class of practitioners, or the followers of any particular system or method of treatment, as exclusively entitled to be regarded as doctors. In adverting to the conflicting views and differences of opinion that exist and have ever existed in the practice of the healing art, it is not to call in question the value of learned, skillful and experienced physicians, but merely to show the error of attempting, in the present state of medical science, to recognize, as matter of law, any one system of practice, or of declaring that the practitioner who follows a particular system is a doctor, and that one who pursues a different method is not. (a)

---

(a) It may, perhaps, be safely questioned, whether the sister sciences of law and theology present any such unity or certainty of opinion as might enable them to arraign the medical profession; and whether the course of human investigation, upon any field of inquiry, is not equally marked by a tenacious adherence to old landmarks and a gradual adoption of new theories of progress. The opposition encountered by Harvey's discovery of the circulation of the blood, finds its counterpart in every stage of natural science, since the persecutions which inaugurated the Copernican system of the universe.— REP.

Corsi v. Maretzek.

The error of the court below consisted in undertaking to do this; in holding that the person appointed by the director was not a doctor, because he practiced upon principles of homeopathy, and in assuming, judicially, that a license from some institution or body, or a degree conferred by some medical college, or the authority of some medical society, was necessary before a man could be considered in the law a practitioner of physic.

The qualifications of physicians have occasionally been made a matter of statute regulation. To secure a certain amount of preparatory knowledge, laws have been passed requiring an attendance upon medical lectures, an examination before a medical board and a certificate from organized medical bodies, before an individual was authorized to practice, or at least before he could maintain an action to recover for his services. Such laws formerly existed in this state, but the legislature, whether wisely or not, thought fit to repeal them by the act of 1844. (Laws of 1844, p. 406.) And since the passage of that act, any person may practice physic in this state, and maintain an action for his services, subject to being punished for a misdemeanor if convicted of gross ignorance, malpractice or immoral conduct, and with a liability to an action for damages in the event of malpractice. If the plaintiff desired a particular kind of physician, he should have stipulated for him; but having left the selection entirely to the director, the director had a right to appoint a homeopathic physician, or to appoint any individual who made it his regular business to practice physic.

Judgment reversed.